UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JONATHAN BLECHER,

                Plaintiff,

    -*against*-

MATTHEW S. GOLDBERG,
ANTHONY J. NOVELLA, and
RONALD TANG,

                Defendants.
------------------------------------------------------------X

Case No. 1:25-cv-10341-JLR

**DECLARATION OF ANTHONY J. NOVELLA OPPOSING DISQUALIFICATION**

       ANTHONY J. NOVELLA declares under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

       1.     I am a named defendant herein. I am also the attorney at the Borah Goldstein law firm which represented plaintiff's former landlord, property manager, and affiliate in the landlord-tenant case he filed in state court,[1] prompting him baselessly to sue me here.

       2.     This declaration opposes plaintiff's motion to disqualify Brian Graifman, the Borah Goldstein attorney who has appeared here to defend me, and any Borah Goldstein attorney from defending me here (ECF 26).

       3.     As an initial matter, since plaintiff filed his motion, new counsel has substituted in for the defendants that we represented in the Blecher State Case and for defendant Matthew Goldberg here (2/2/26 Order, ECF 42). The only extant representation is Brian D. Graifman, Esq. of Borah Goldstein, representing me.

---

[1]    *Jonathan Blecher v. WAM Equity Partners, LLC, WAM Partners, Van Dorn Holdings LLC, William Moses Co. Inc. and The Guarantors*, Index No. 160971/2025 (Sup. Ct. New York County) (per plaintiff's proposed amended summons adding parties) (the **"State Case"**).

4. Plaintiff's motion as so limited should be denied because, among other reasons, I never had any contact or communication whatsoever with plaintiff Blecher until appearing as an attorney in the state court case he filed *pro se*; I am not a witness to any of the underlying landlord-tenant dispute and am highly unlikely to be needed or called to testify, having knowledge neither material nor necessary concerning his case; there are no conflicts, as my interests and those of Borah Goldstein and its attorneys are completely aligned with those of the former client-defendants vis-à-vis plaintiff and his cases; and the case is highly unlikely to last beyond summary dismissal, making his motion not only deficient, but premature.

A. **My Position and Borah Goldstein**

5. I am Of Counsel to Borah, Goldstein, Nahins & Goidel, P.C. (Borah Goldstein), currently in its landlord-tenant division, representing mainly landlords.

6. My case load is high volume, comprised mostly of summary eviction proceedings in housing court involving dollar amounts in controversy much more suitable for housing and civil court than federal court.

7. Having such cases conducted on an expeditious basis, typical of those I handle, inures overall to the benefit of tenants, reducing the cost of landlord-tenant disputes and affordability of housing.

8. Litigants such as plaintiff here, on the other hand, have the opposite effect, burdening the system and increasing costs, especially as here by bringing frivolous satellite litigation against a landlord's attorney.

9. Case law recognizes that it is against public policy for litigants, as here, to sue their opponents' attorneys for merely representing their clients in good faith (see accompanying memorandum of law).

**B.      The Underlying Landlord-Tenant Dispute**

10.     I was not involved in the underlying landlord-tenant dispute until afterwards and have no first-hand knowledge of it.

11.     For the details of that dispute, I reference the December 1, 2025 Affirmation of Matthew Goldberg, filed in the State Case as [NYSCEF #80](#) (**Exh. A** hereto).[2]

12.     According to his affirmation, Mr. Goldberg is the Director of William Moses Co. Inc., the managing agent for Van Dorn Holdings LLC – plaintiff's prior landlord and owner of 150 West 58th Street, New York, NY (the **"Building"**), where plaintiff resided.  The landlord is also an affiliate of WAM Equity Partners, LLC, the building's co-managing agent. (Goldberg Aff. ¶ 1) (all three entities collectively referred to here as the **"Landlord Entities"**).

13.     Much of what Mr. Goldberg relates is irrefutable, corroborated by a small universe of documentary evidence, and indeed by plaintiff.

14.     Mr. Goldberg was personally involved in the Building's day-to-day operations, including tending to landlord-tenant issues (Goldberg Aff. ¶ 2).

15.     Plaintiff became the tenant of Unit 10-D in the Building pursuant to a written lease dated October 11, 2024 for a term commencing November 1, 2024 and expiring October 31, 2025, at a monthly rent of $4,100 (*id.* ¶ 4).

16.      Plaintiff provided a $4,100 security deposit, but as he was a recent law school graduate with no employment history, a guarantor was required.  In lieu of a guarantor, plaintiff

---

[2]     I also provide hyperlinks to the NYSCEF filings, as they represent the official court record of the state case. *See* Uniform Rules for New York State Trial Courts, 22 NYCRR § 202.5-b(d)(4) ("the official record shall be the electronic recording of the document stored by the County Clerk," which "shall also be filed in the NYSCEF system), applicable to mandatory efiled cases by *id.* § 202.5-bb(a).

obtained a lease rental bond in amount of $12,3000 (3 months' rent) through GuarantR, Inc d/b/a TheGuarantors (Goldberg Aff. ¶ 5).

17. Not four months into the lease term, on February 23, 2025, plaintiff emailed Goldberg and another Landlord Entity representative that he (Blecher) was laid off, he could not continue renting the premises, and that he bought a ticket to Canada that day (Goldberg Aff. ¶ 10). A mutual termination agreement was proposed in exchanged emails whereby the landlord would keep the $4,100 security deposit and Blecher would return the keys (Goldberg Aff. ¶¶ 11-12).

18. Plaintiff thereafter emailed that they could have the apartment because he had abruptly left the country and that he would return the keys (Goldberg Aff. ¶¶ 14-16).

19. Plaintiff failed to reveal in his emails, however, that he had left in the apartment the entirety of his personal belongings, including furniture, appliances, clothing, food, toiletries – certainly not leaving the premises in broom-clean condition as required (Goldberg Aff. ¶ 17).

20. But that is exactly what plaintiff did, abandoning the premises while leaving those obstacles, and without ever returning the keys, violating various lease terms (Goldberg Aff. ¶ 17-22).

21. The landlord suffered damages for which it was entitled to recover under the lease, including a conditional concession of $3,164.62 that it had paid back to plaintiff as a rebate at the start of the lease term (Goldberg Aff. ¶ 21).

22. Notwithstanding these serious and costly lease violations, the landlord mitigated damages by cleaning the premises, making repairs, including painting and plastering, and renting to another tenant starting April 2025 (Goldberg Aff. ¶¶ 21-23).

23. The landlord kept the $4,100 security deposit and submitted a nominal $4,100 claim under the $12,300 lease rental bond to recoup losses not covered by the security deposit (Goldberg Aff. ¶¶ 22-23). The surety originally looked to plaintiff to recover that loss, but due to his aggressive and abusive communications, it waived its claim, eliminating any cognizable loss to plaintiff (*id.* ¶ 24-25).

24. Plaintiff nonetheless filed his groundless state court action on August 15, 2025, against the Landlord Entities and the guarantee company, and as a purported class action (the "State Court Lease Action" referenced in ¶ 4 of his complaint here).

C. **My *Non*-Involvement with Plaintiff's Landlord-Tenant Dispute (Until He Sued), Limited to Coordinating Response(s) to the NYPD and District Attorney's Office**

25. At Borah Goldstein I have only represented an unrelated affiliate of the Landlord Entities in a single, unrelated summary eviction proceeding involving a different tenant in a different building. That tenant was represented by experienced counsel at all pertinent times. I did not work with Matthew Goldberg on that case. I worked with a different individual altogether with whom, to the best of my knowledge and recollection, I have not communicated at all with about plaintiff in any context, let alone, this or the state court case. I also note that the Landlord Entities and affiliates are not my clients in terms of generation.

26. My involvement with plaintiff's matter was limited, not directly tied to the landlord-tenant relations (until he sued), and began tangentially, in response to a joint investigation by the Major Case Intelligence Team of the NYPD Intelligence Division and the Rackets Bureau of the New York County District Attorney's Office into a person of interest generally in the Building.

27. I first learned of the investigation on or about November 15, 2024, after speaking with Mr. Goldberg, who included me on an email with the detective who had contacted and

spoken with him.

28. From my discussion with the detective, he reiterated what he had told Mr. Goldberg, alerting us that someone – *who he would not identify* – was living in the building who was potentially dangerous and that we would be contacted by the District Attorney's office.

29. As one might imagine, this was very unsettling news about which the landlord and property manager craved more detail, but the front turned quiet for the next month or so, and my emails and telephone calls to the detective went unanswered.

30. That is until January 9, 2025, when Mr. Goldberg and I received an email from the New York County District Attorney's Office, Rackets Bureau, attaching a Grand Jury Subpoena requesting identifying information for *all* occupants, tenants, and leaseholders of the Building for a specified period of time.

31. Eventually I convinced the DA's office to narrow the subpoena's scope, limiting it to Unit 10-D, resulting in a subpoena response covering two occupants, one of them being Blecher, the other being the tenant of Unit 10-D immediately prior to Blecher.

32. Blecher thereafter sent his February 23, 2025 email and fled the country.

33. I had no further involvement in Blecher's matter until after he filed his state court lawsuit, in which I appeared as counsel.

34. And after Blecher filed that suit, I had no further communications with the NYPD or District Attorney's Office.

35. Moreover, the investigation has no direct relationship to the landlord-tenant dispute, which is governed by the terms of the lease and related documents; the criminal investigation is a side show.

36. I understand that at some point after Blecher absconded from the Building, Mr. Goldberg communicated with the criminal authorities, who confirmed that Blecher was the target of their investigation.

37. As Mr. Goldberg states in his affirmation:

> I can only surmise that this lawsuit is retribution for the [Landlord] Defendants' cooperation with law enforcement in connection with a certain criminal investigation into Plaintiff by the New York County District Attorney's Office. Mere weeks after Plaintiff signed the Lease, I was personally contacted by an NYPD detective of the Major Case Intelligence Team from the NYPD's Intelligence Division, and later, an assistant district attorney in the Rackets Bureau regarding an ongoing criminal investigation into Plaintiff. Shortly thereafter, I received a subpoena from the Rackets Bureau. I personally compiled and oversaw the production of documents and other information in the [Landlord] Defendants' possession responsive to the subpoena as legally required. Upon receiving Plaintiff's February 23, 2025 email(s), I immediately suspected Plaintiff's abrupt departure was related to the criminal investigation.

(Goldman Aff. ¶ 26)

38. At most, the information learned from the criminal investigation might explain why the landlord and property manager were so quick to let Blecher go with few financial consequences to him, but that would be a matter for Mr. Goldberg, if anyone, to elucidate upon.

39. **It is most certainly plausible, if not likely, in my view, that the criminal investigation and the landlord/manager's communications with those authorities likely explains why Blecher is suing us, not just vindictively, but as a means of finding out what we and the authorities know about him, his activities, and those of any cohorts – a completely improper purpose. The court should cut this still burgeoning fiasco short.**

40. Even if the criminal investigation and subpoena response were somehow probative of the merits of plaintiff's joint and several claims – which they are not – Mr. Goldberg, as noted above, was a party to the telltale emails and phone calls, including the initial telephone call with the NYPD detective, emailing the detective and including me as an

introduction, and receiving the same District Attorney's Office email that I received, which attached the Grand Jury subpoena.

41. As such, my testimony is neither material nor necessary.

**D. There is No Conflict Between Me, Borah Goldstein, or Mr. Graifman with the Other Defendants**

42. Beyond plaintiff's baseless speculation, my interests and those of Borah Goldstein and its attorneys in relation to our former defendant-clients are completely aligned vis-à-vis plaintiff and his cases. There is no "conflict" other than in plaintiff's untethered imagination. There are none under Rule 1.7 of the New York Rules of Professional Conduct (Conflict of Interest: Current Clients), which as amended effective November 10, 2025 – plaintiff cites only the former rule – assigns the movant a heavier burden of demonstrating that "the representation of one client will be *directly adverse* to another client." (emphasis added to indicate significance of amended text).

43. Plaintiff, though, fails to meet his high burden to show that the representation will be "directly adverse" to any other client or former client or that there is a "significant risk" that the representation will be "materially limited" or that the "independent professional judgment" of the participating lawyer in the firm will be "adversely affected" (Rule 1.7(a)) and there is no such significant risk.

44. And in harmony with Rule 1.9 (Duties to Former Clients), there are no interests "materially adverse to the former clients," nor is there any "confidential information" to be used to the former clients' disadvantage, or that needs to be revealed for a current client.

45. What plaintiff poses as "conflicts" are but minor discrepancies, inadvertent mistakes corrected, and/or no conflict at all, but for plaintiff's warped misinterpretation of

evidence – and plaintiff knows this, which he cannot help but reveal in his writings, wasting precious party and judicial resources.

46. <u>The Receipt of Funds "Conflict"</u>. Plaintiff complains that in the State Case "Novella filed an Answer Verified by Matthew Goldberg . . . denying the receipt of specific insurance funds," while later, "Goldberg admitted in a sworn Affirmation that those exact funds were received" (Disqualification MOL, ECF 26-1, at 1; *see id.* at 10-11). Obviously, in the 32 days between those filings, the latter corrected the former, as plaintiff well knows when he writes that Goldberg "admitted" the funds were received. This is no conflict between Goldberg and me, it is Goldberg correcting Goldberg. The correction has the effect under New York practice of conforming the pleading to the evidence – representing New York's practical procedure rising to the occasion, harmonizing the filings.

47. <u>The April 7 Receipt "Conflict"</u>. Plaintiff's next manufactured "conflict" is his assertion that the April 7, 2025, receipt for plastering and painting (ECF 26-5) "is a chronological impossibility" because "the new tenant took possession on April 1st" (Disqualification MOL, ECF 26-1, at 11). That is, unless the invoice is one for past services rendered, as they often are (or that the services were performed after the subsequent tenant took possession, *e.g.*, before or even after moving furniture in, which in my experience as a landlord attorney is possible). There could only be a "conflict" if plaintiff's suppositions are indulged. Accordingly, plaintiff's grandstanding about preserving "metadata" for the laborers' invoice is doomed to lead nowhere, as the invoice contains nothing about when the services were performed.

48. <u>The "not less than $100,000" Fee Request "Conflict"</u>. The next supposed conflict, and in plaintiff's framing "fraud," concerns my inartful inclusion of the words "to date"

in referring to legal fees, costs, and disbursements after making crystal clear, in the same sentence, that the cause of action is for legal fees that the Landlord Entities "*have and will continue to incur*":

> 84. Defendants *have and will continue to incur* legal fees, costs and disbursements based on Plaintiff's actions and conduct before and after commencement of this action, which, to date, totals not less than $100,000.00.
>
> 85. Defendants request judgment against Plaintiff for the fair and reasonable value of Defendants' attorneys' fees, costs and disbursements incurred in this action, *in an amount to be determined by the Court*, but not less than $100,000.00.

(Answer in State Case, NYSCEF #31, ¶¶ 84-85 (emphases added)).

49. Plaintiff crows that "[g]enerating this fee in an eight-hour window is a physical impossibility" (Disqualification MOL, ECF 26-1 at 6). Plaintiff's position is firmly rooted in his extraction of the words, "*to date*" – frivolously manufacturing a controversy, by way of motion practice in the state court action and commencement of this action as a whole – while simultaneously ignoring the clause, "*have and will continue to incur*" in the same sentence and making clear that the Landlord Entities' legal fees total "*an amount to be determined by the Court*" in the very next sentence.

50. Finally, plaintiff's other disagreements about legal positions are just that, legal disagreements, a category insufficient to support plaintiff's claims here, and on which the attorneys and former clients here are aligned.

**E.     My Desire for Mr. Graifman as my Counsel**

51. For the period during which this case pends against me, I very much desire Mr. Graifman to represent and defend me from this abusive plaintiff and believe that Mr. Graifman has a unique background suited for the matter.

52. After the firm directed me to see Mr. Graifman about this case, he jumped right in, appearing as counsel and attending to plaintiff's incessant and incomprehensible filings.

53. Mr. Graifman served as Law Clerk to Hon. Roger J. Miner at the Court of Appeals for the Second Circuit and as an associate at Skadden, Arps, Slate, Meagher & Flom LLP. Among the accolades conferred upon him, the Federal Courts Committee of the New York County Lawyers Association presented him with its 2013 David Hinshaw Award for Conspicuous and Outstanding Service. He has the highest AV Preeminent rating of Martindale Hubbell's blind solicitation peer review. And recent among his many legal articles is *What?! My Hidden Data Exposed on My ECF Filings?*, N.Y.L.J., Aug. 18, 2025 at 4, col. 3 (online version Aug. 15, 2025),[3] addressing metadata, a particular obsession of plaintiff's here.

54. Mr. Graifman also obtained a recent litigation injunction against another abusive *pro se* plaintiff-attorney and court referral of that plaintiff to the disciplinary authorities. *See Wexler v. Auxiliary of the Landlord & Landlords of the Subject Premises, et al.*, Index 100089/2024 (Sup. Ct. New York County Nov. 10, 2025) (NYSCEF #130).

55. This may become relevant, considering how plaintiff, a New York admitted attorney, in his 118-page complaint, describes me with an Italian slur, referring to me – Anthony Novella, a name overtly signifying Italian descent – very derogatively and hurtfully, as the "Consiglieri" of a scheme that exists only in plaintiff's mind, and multiple times at that, either in quotes or italicized for emphasis (Complaint, ECF 1, at internal pages 2, 8, & 51). Plaintiff repeats the same moniker in connection with his disqualification motion in his January 29, 2026 letter to the court (ECF 38 at 1).

---

[3]    https://www.law.com/newyorklawjournal/2025/08/15/what-my-hidden-data-exposed-on-my-nyscef-and-ecf-filings/?slreturn=20260202170732

56. I believe that Mr. Graifman's representation will be absolutely crucial in protecting my interests as an object of plaintiff's bitter and irrational crusade, which is exacerbated by plaintiff's unemployment, as plaintiff himself confirms in the following emailed taunt, filed in the State Case:

> I am an out of work New York Licensed Attorney and I have nothing better to do than to seek retribution, damages and compensation . . . . Please do not take the fact that I was laid off as a reflection of my competence as an attorney. . . . [T]hat reflect[s] more on my grit and upholding my principles than to my ability to practice law. To bolster this I will tell you that I scored in the 99th Percentile on the New York Bar Exam.

([NYSCEF #90](NYSCEF #90))

57. Finally, to deprive me of counsel of my choice would be unfair, prejudicial, and burdensome to me.

WHEREFORE, plaintiff's motion for disqualification should be denied in its entirety.

Executed:   February 8, 2026
            New York, New York

Respectfully submitted,

_____
Anthony Novella