SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| JONATHAN BLECHER,<br><br>       Plaintiff,<br><br>    -against-<br><br>WAM EQUITY PARTNERS, LLC, WAM PARTNERS, VAN DORN HOLDINGS LLC, WILLIAM MOSES CO. INC., and THE GUARANTORS,<br><br>       Defendants. | Index No. 160971/2025<br><br>**AFFIRMATION** |

  MATTHEW GOLDBERG affirms this 1st day of December 2025, under the penalties for perjury under the laws of New York, which may include a fine or imprisonment, that he is fully familiar with facts and circumstances stated herein, the following is true and understands that this document may be filed in an action or proceeding in a court of law.

## BACKGROUND

### *The Parties, Premises, Lease, and Term*

  1. I am the Director of co-defendant WILLIAM MOSES CO. INC., managing agent for co-defendant VAN DORN HOLDINGS LLC ("Van Dorn"), the owner of 150 West 58th Street, New York, New York (the "Building") and affiliate of WAM EQUITY PARTNERS, LLC, the latter of which is itself an affiliate of co-defendant William Moses Co. Inc. and co-managing agent of the Building (hereinafter collectively, the "Van Dorn Defendants," unless a distinction is noted). A true and accurate copy of Van Dorn's June 27, 2012 deed is annexed hereto as **Exhibit D.**

  2. I am not an owner, employee, or manager of the Van Dorn entity. I cannot unilaterally bind Van Dorn to leases or lease amendments, or any other agreements, written or verbal, of whatsoever nature; however, I am personally involved in the Building's day-to-day operations, including tending to landlord-tenant issues as same may arise from time to time.

1

3. Co-Defendant "WAM Partners LLC" is an entity wholly unknown, unfamiliar, and completely unrelated to the Van Dorn Defendants and/or me. There is no commonality of ownership, agency, or control amongst and between "WAM Partners" and the Van Dorn Defendants, or any of them.

4. Plaintiff Jonathan Blecher is the former tenant of Unit 10-D in the Building (the "Subject Premises") pursuant to a written lease agreement between Plaintiff and Van Dorn, dated October 11, 2024 (the "Lease"), for a term commencing November 1, 2024, and expiring October 31, 2025 (the "Term"), at a monthly rent of $4,100.00. There is no dispute that the Lease is between Plaintiff and Van Dorn. A true and accurate copy of the Lease, produced by Plaintiff in motion sequence no. 3 at NYSCEF Doc. No. 39), is reannexed hereto as **Exhibit E**.

*The Lease Rental Bond & Indemnity Agreement*

5. Plaintiff is a recent law school graduate with no employment history. As such, Plaintiff did not independently meet Van Dorn's qualifications for approval of the Lease. In lieu of requiring a guarantor, co-Defendant Van Dorn Holdings required that Plaintiff obtain a lease rental bond (the "Lease Rental Bond"), in an amount equal to three (3) months' rent ($4,100.00 x 3 = $12,300.00). Plaintiff procured the Lease Rental Bond through co-defendant GuarantR, Inc. d/b/a TheGuarantors (hereinafter, the "Guarantors"). The Guarantors are a third-party entity wholly unrelated to the Van Dorn Defendants, with no commonality of ownership, agency, or control amongst and between them. The Guarantors facilitate(s) procurement of lease rental bonds for tenants such as Plaintiff in lieu of a personal guaranty. The Lease Rental Bond here, like all lease rental bonds, protects landlords (here, Van Dorn) from losses resulting from, among other things: a tenant's non-payment of rent, abandonment/vacating prior to expiration of the term, and/or termination of a lease prior to expiration of the term, etc. The surety of the Lease Rental

2

Bond is Trisura Insurance Company (the "Surety"). A true and accurate copy of the Lease Rental Bond, along with its "General Terms & Conditions," produced by the Guarantors in connection with motion sequence no. 1 (NYSCEF Doc. No. 20), is reannexed hereto as **Exhibit F**.

6. As part and parcel of procuring the Lease Rental Bond, Plaintiff signed a General Agreement of Indemnity (the "Indemnity Agreement"), produced by the Guarantors in motion sequence no. 1 (NYSCEF Doc. No. 20), a true and accurate copy of which is reannexed hereto as **Exhibit G**. Section 6 of the Indemnity Agreement makes clear that the *Surety*, not Plaintiff, has exclusive rights over assessing the *bona fides* of any and all claims submitted by Van Dorn under the Lease Rental Bond, and that any such findings shall be "binding and conclusive upon" Plaintiff:

> 6. **Settlement of Claims**: The Surety shall have the exclusive right to adjust, settle, or compromise any claims, demand, suit or any other proceeding arising out of any Bonds against the Surety and/or the Indemnitors, take whatever action it deems appropriate in response thereto, and the Surety's determination of whether to defend or settle the same shall be binding and conclusive upon the Indemnitors. In the event of a payment by the Surety, the Indemnitors agree that in any accounting between the Surety and the Indemnitors, the Surety shall be entitled to charge for any and all disbursements made by it about the matters herein contemplated by this Agreement plus pre- and post-judgment interest. In the event of any payment by the Surety, an itemized statement of the amount of any such payment sworn to by any officer or authorized representative of the Surety, or any voucher or vouchers, invoices or other evidence of such payment shall be prima facie evidence of the fact and the amount of such payment, and the extent of the Liability of the Indemnitors to the Surety, and, in the absence of actual fraud or bad faith amounting to dishonesty or malicious conduct, shall be final, conclusive and binding upon the Indemnitors in any claim, suit or other proceeding. Any payment made on behalf of the Surety shall exclude the Indemnitors from any future bond or any other coverage with said Surety.

### *The February 23, 2025 Emails*

7. Plaintiff asserts that a certain February 23, 2025 email exchange between Plaintiff and me operates as a "mutual termination agreement" of the Lease between Plaintiff and Van Dorn. True and accurate copies of the emails I personally exchanged with Plaintiff, produced by Plaintiff in connection with motion sequence no. 4 (NYSCEF Doc. No. 44), starting with Plaintiff's email on February 23, 2025, at 9:26 a.m., are collectively reannexed hereto as **Exhibit G**.

8. First and foremost, Section 27 (d) of the Lease makes clear that any emails between Plaintiff and me, or anyone else for that matter, regarding termination of the Lease, cannot bind Van Dorn to a "mutual termination" agreement. Section 27(d) makes clear that early termination of the Lease can only be achieved by and through a signed writing between Plaintiff and an authorized signatory of Van Dorn:

3

> 27. **NO WAIVER OF LEASE PROVISIONS**
> A. Even if Owner accepts your rent or fails once or more often to take action against You when You have not done what You have agreed to do in this Lease, the failure of Owner to take action or Owner's acceptance of rent does not prevent Owner from taking action at a later date if You again do not do what You have agreed to do.
> B. Only a written agreement between You and Owner can waive any violation of this Lease.
> C. If You pay and Owner accepts an amount less than all the rent due, the amount received shall be considered to be in payment of all or a part of the earliest rent due. It will not be considered an agreement by Owner to accept this lesser amount in full satisfaction of all the rent due.
> D. Any agreement to end this Lease and also to end the rights and obligations of You and Owner must be in writing, signed by You and Owner or Owner's agent. Even if You give keys to the Apartment and they are accepted by any employee, or agent, or Owner, this Lease is not ended.

9. If the Court entertains the absurd and meritless proposition that the February 23, 2025 emails, in and of themselves could possibly bind Van Dorn to a non-existent "mutual termination agreement" with Plaintiff, Plaintiff still failed to perform pursuant to the purported "terms" of "our" (phantom) "mutual termination agreement," by failing to return the keys despite expressly promising to do so, as further discussed immediately below.

10. On February 23, 2025, at 9:26 a.m., Plaintiff sent an email to a co-worker and me, informing us that he "got laid off," he "bought a ticket to Canada today," and he "can no longer continue renting the Premises." This only three (3) full calendar months (November, December, and January) into the Term and with approximately nine (9) months remaining in the Term. Plaintiff's email states:

> On Sun, Feb 23, 2025 at 9:26 AM jonathan blecher <jonathan.blecher@yahoo.com> wrote:
> Hi Matthew and Alison,
>
> Hope you're well
>
> Due to an unfortunate turn of events I can no longer continue renting <u>150W 58th st apt 10-D</u> as I got laid off.
>
> I bought the ticket to Canada today.
>
> I have paid already for February
>
> Thank you for your help
>
> Best regards,
> Jonathan

11. At 9:54 a.m., I proposed a possible "mutual termination agreement" with conditions including but not limited to: (i) Van Dorn must retain Plaintiff's security deposit of $4,100.00, "to offset losses tied to the remainder of your current lease"; and (ii) Plaintiff would return his keys to the Subject Premises to the front desk of the Building (none of these terms precluded the

4

company's right to pursuant to the a surety bond from "The Guarantors" to offset any additional losses sustained by Plaintiff's early vacatur:

> On Sunday, February 23, 2025, 09:54, Matthew Goldberg <msg@wamnetworks.com> wrote:
>
> Hi Jonathan,
>
> Thank you for your email. Very sorry to hear this news.
>
> As you may be aware, you not able to terminate your lease without mutual agreement. We will hereby agree to a mutual termination of your current lease agreement provided that we retain your security deposit to offset losses tied to the remainder of your current lease.
>
> Please confirm when you have returned keys to the front desk/possession of the apartment so we can take necessary steps to start the process of marketing the apartment for new lease.
>
> Best,
> Matthew

12. At 9:56 a.m., Plaintiff relinquished his security deposit and promised to return his keys to the Subject Premises as part and parcel of any "mutual termination agreement":

> On Sun, Feb 23, 2025 at 9:56 AM jonathan blecher <jonathan.blecher@yahoo.com> wrote:
>
> Hi Matthew,
>
> That mutual agreement as you explained is acceptable.
>
> I can ship the keys to you as soon as I am back in the US. Early next month.
>
> Thanks again
>
> Best,
> Jonathan

13. At 10:15 a.m., I explained to Plaintiff that management would change the locks for the purpose of securing and showing the space to prospective tenants, for Van Dorn to mitigate its damages resulting from Plaintiff's abrupt vacatur. I most certainly did not inform Plaintiff he was no longer obligated to return the keys:

> On Sunday, February 23, 2025, 10:15, Matthew Goldberg <msg@wamnetworks.com> wrote:
>
> Unfortunately we would need to start showing the apartment immediately given this short notice the significant losses we will likely incur, so we will have to change the locks for security reasons.
>
> Please confirm when you have vacated and returned possession and we will change the locks and begin showing/preparing/marketing the apartment.
>
> Thank You,
>
> Matthew S. Goldberg
> Managing Director

14. At 10:37 a.m., Plaintiff responded as follows:

> On Sun, Feb 23, 2025 at 10:37 AM jonathan blecher <jonathan.blecher@yahoo.com> wrote:
>
> Hi Matthew,
>
> You can have the apartment now. I have left.
>
> Best regards,
> Jonathan

15. At 10:43 a.m., I informed Plaintiff he still needed to return the keys:

> On Sunday, February 23, 2025, 10:43, Matthew Goldberg <msg@wamnetworks.com> wrote:
>
> Ok, no problem. Thank you for confirming we have possession of the apartment now. If you can mail the keys back when you have, that would chance would be great. We will have our team change the locks tomorrow.
>
> Thank You,
>
> Matthew S. Goldberg
> Managing Director

16. At 10:45 a.m., Plaintiff confirmed he would return the keys "for sure":

> From: jonathan blecher (jonathan.blecher@yahoo.com)
> To: msg@wamnetworks.com; wamadmin@wamnetworks.com; alison@wamnetworks.com
> Date: Sunday, February 23, 2025 at 10:45 PM GMT+7
>
> Ok great, will do for sure. Thank you
>
> Best,
> Jonathan

17. Plaintiff did not return to the Subject Premises, ever. Plaintiff did not return the keys to the Subject Premises, ever. Plaintiff did not vacate the Subject Premises in broom-clean condition as required by the Lease. Plaintiff most certainly did not heed any arrangement contemplated by the February 23, 2025 emails. Plaintiff simply and abruptly abandoned the Subject Premises on mere hours' notice with approximately nine (9) months remaining in the Term. Plaintiff left the entirety of his personal belongings behind in the Subject Premises, including clothing, food, furniture, toiletries, and appliances, etc.

18. Section 8 of the Lease makes clear that the manner and condition in which Plaintiff abandoned the Subject Premises is the equivalent of never having vacated in the first instance:

> 8. CARE OF YOUR APARTMENT-END OF LEASE-MOVING OUT
> A. You will take good care of the apartment and will not permit or do any damage to it, except for damage which occurs through ordinary wear and tear. You will move out on or before the ending date of this lease and leave the Apartment in good order and in the same condition as it was when You first occupied it, except for ordinary wear and tear and damage caused by fire or other casualty.
> B. When this Lease ends, You must remove all of your movable property. You must also remove at your own expense, any wall covering, bookcases, cabinets, mirrors, painted murals or any other installation or attachment You may have installed in the Apartment, even if it was done with Owner's consent. You must restore and repair to its original condition those portions of the Apartment affected by those installations and removals. You have not moved out until all persons, furniture and other property of yours is also out of the Apartment. If your property remains in the Apartment after the Lease ends, Owner may either treat You as still in occupancy and charge You for use, or may consider that You have given up the Apartment and any property remaining in the Apartment. In this event, Owner may either discard the property or store it at your expense. You agree to pay Owner for all costs and expenses incurred in removing such property. The provisions of this article will continue to be in effect after the end of this Lease.

19. Plaintiff's abrupt abandonment is a material breach of Section 16 of the Lease:

> 16. DEFAULT
> (1) You default under the Lease if You act in any of the following ways:
>     (a) You fail to carry out any agreement or provision of this Lease;
>     (b) You or another occupant of the Apartment behaves in an objectionable manner;
>     (c) You do not take possession or move into the Apartment 15 days after the beginning of this Lease;
>     (d) You and other legal occupants of the Apartment move out permanently before this Lease ends;
> If You do default in any one of these ways, other than a default in the agreement to pay rent, Owner may serve You with a written notice to stop or correct the specified default within 10 days. You must then either stop or correct the default within 10 days, or, if You need more than 10 days, You must begin to correct the default within 10 days and continue to do all that is necessary to correct the default as soon as possible.
> (2) If You do not stop or begin to correct a default within 10 days, Owner may give You a second written notice that this Lease will end six days after the date the second written notice is sent to You. At the end of the 6-day period, this Lease will end and You then must move out of the Apartment. Even though this Lease ends, You will remain liable to Owner for unpaid rent up to the end of this Lease, the value of your occupancy, if any, after the Lease ends, and damages caused to Owner after that time as stated in Article 18.
> (3) If You do not pay your rent when this Lease requires after a personal demand for rent has been made, or within three days after a statutory written demand for rent has been made, or if the Lease ends, Owner may do the following: (a) enter the Apartment and retake possession of it if You have moved out or (b) go to court and ask that You and all other occupants in the Apartment be compelled to move out.
> Once this Lease has been ended, whether because of default or otherwise, You give up any right You might otherwise have to reinstate or renew the Lease.

20. Section 17 of the Lease delineates Van Dorn's remedies for Plaintiff's material breach(es):

> 17. REMEDIES OF OWNER AND YOUR LIABILITY
> If this Lease is ended by Owner because of your default, the following are the rights and obligations of You and Owner.
>     (a) You must pay your rent until this Lease has ended. Thereafter, You must pay an equal amount for what the law calls "use and occupancy" until You actually move out.
>     (b) Once You are out, Owner may re-rent the Apartment or any portion of it for a period of time which may end before or after the ending date of this Lease. Owner may re-rent to a new tenant at a lesser rent or may charge a higher rent than the rent in this Lease.
>     (c) Whether the Apartment is re-rented or not, You must pay to Owner as damages:
>         (1) the difference between the rent in this Lease and the amount, if any, of the rents collected in any later lease or leases of the Apartment for what would have been the remaining period of this Lease; and
>         (2) Owner's expenses for advertisements, broker's fees and the cost of putting the Apartment in good condition for re-rental; and
>         (3) Owner's expenses for attorney's fees.
>     (d) You shall pay all damages due in monthly installments on the rent day established in this Lease. Any legal action brought to collect one or more monthly installments of damages shall not prejudice in any way Owner's right to collect the damages for a later month by a similar action.
> If the rent collected by Owner from a subsequent tenant of the Apartment is more than the unpaid rent and damages which You owe Owner, You cannot receive the difference. Owner's failure to re-rent to another tenant will not release or change your liability for damages, unless the failure is due to Owner's deliberate inaction.

21. Van Dorn was left to absorb the costs of removing/discarding Plaintiff's belongings, in addition to costs incurred getting the Subject Premises ready for a new tenant (i.e., painting and plastering). Van Dorn did not collect March 2025 rent of $4,100.00 because of Plaintiff's abrupt abandonment. Moreover, Exhibit A of the Lease (the Lease is <u>Exhibit C</u> hereto)

speaks to a certain conditional "Rebate Payment" of $3,164.62 Plaintiff received at the tenancy's inception, reimbursable to Van Dorn based on Plaintiff's defaults heretofore described:

> **REBATE:**
>
> Owner hereby agrees to provide Tenant a one-time total rebate of $3,164.62 (three thousand one hundred sixty-four dollars and sixty-two cents), provided that Tenant is not in default of this Lease and the riders annexed to the lease. This rebated rent will be paid to Tenant via check in 1 (one) installment.
>
> **Rebate Payment**
>
> The rebate payment in the amount of $3,164.62 (three thousand one hundred sixty-four dollars and sixty-two cents) will be made to Tenant via a check by December 31, 2024.
>
> By accepting this rebate, Tenant explicitly understands and agrees that they must fulfill and honor all requirements and obligations as required under their Lease Agreement. In the event Tenant defaults or breaches the Lease Agreement, Owner shall have the right to immediately cancel/void this agreement and or any other rebates/discounts or concessions that had previously been offered and or agreed to related to Tenant's Lease. Furthermore, in the event Tenant defaults or breaches the Lease Agreement, then Owner shall have the right to recoup this Rebate and or any other Rebates, concessions or discounts in conjunction with the Tenant's Lease at any time.

22. Van Dorn was and is well within its rights to retain Plaintiff's security deposit under Section 4 of the Lease, which states:

> 4. **SECURITY DEPOSIT**
> You are required to give Owner the sum of $*4,100.00 (four thousand one hundred dollars and zero cents)__ when You sign this Lease as a security deposit, which is called in law a trust. Owner will deposit this security in _Astoria Federal Savings__ bank at _____New York, NY_____ If the Building contains six or more apartments, the bank account will earn interest. If You carry out all of your agreements in this Lease, at the end of each calendar year Owner or the bank will pay to Owner 1% interest on the deposit for administrative costs and to You all other interest earned on the security deposit.
>   If You carry out all of your agreements in this Lease and if You move out of the Apartment and return it to Owner in the same condition it was in when You first occupied it, except for ordinary wear and tear or damage caused by fire or other casualty, Owner will return to You the full amount of your security deposit and interest to which You are entitled within 14 days after this Lease ends. However, if You do not carry out all your agreements in this Lease, Owner may keep all or part of your security deposit and any interest which has not yet been paid to You necessary to pay Owner for any losses incurred, including missed payments.
>   If Owner sells or leases the building, Owner will turn over your security, with interest, either to You or to the person buying or leasing (lessee) the building within 5 days after the sale or lease. Owner will then notify You, by registered or certified mail, of the name and address of the person or company to whom the deposit has been turned over. In such case, Owner will have no further responsibility to You for the security deposit. The new owner or lessee will become responsible to You for the security deposit.
> *Tenant has paid Rent for first (1st) month, Early Use & Access, and one (1) month Security Deposit at the time of lease signing.
> *Please see attached "Exhibit A", "Exhibit B", & "The Guarantors Coverage Rider" in relation to this Lease Agreement.
> *Tenant is required to have 3 Months "The Guarantors" Coverage.

23. Unfortunately, Plaintiff's $4,100.00 security deposit did not fully offset Van Dorn's damages caused by Plaintiff's abandonment. Accordingly, Van Dorn submitted a $4,100.00 claim under the $12,300.00 Lease Rental Bond to recoup the balance of its losses not covered by the security deposit. Van Dorn's $4,100.00 claim was approved by the Surety. Van Dorn was, in fact, reimbursed by the Surety for said amount. Again, the Lease Rental Bond covers damages up to $12,300.00 (equal to *three (3) months'* rent); however, Van Dorn only submitted a claim for

$4,100.00 because, among other things, it successfully mitigated its damages by getting the Subject Premises fit up for a new tenant for a term which commenced April 1, 2025.

24. Section 6 of the Indemnity Agreement cannot be clearer. The Surety, not Plaintiff *or* the Guarantors, determines whether a claim is *bona fide* or fraudulent. The Surety approved Van Dorn's claim. In that context, the Complaint merely reflects Plaintiff's opinion that Van Dorn's $4,100.00 claim was bloated (it was not). All the while, Plaintiff *literally* fails to plead any cause of action against his actual landlord, Van Dorn, the only party to this litigation ever in privity of contract or estate with Plaintiff, and claimant under the Lease Rental Bond.

25. What makes this lawsuit particularly egregious is that the Surety, as a gesture of goodwill and to curb Plaintiff's aggressive communications, waived its right of collection against Plaintiff under the Indemnity Agreement for the $4,100.00 it paid out on Van Dorn's claim and made clear in the emails it would not pursue Plaintiff for same (NYSCEF Doc. No. 43) (**Exhibit H**). As such, Plaintiff has suffered exactly $0.00 in damages. Having suffered exactly $0.00 in damages, the true meaning and significance of the emails between Plaintiff and the Guarantors' representatives (NYSCEF Doc. No. 43) is that they jointly and severally establish Plaintiff's running breach of his obligations under Section 6 of the Indemnity Agreement, which expressly prohibits Plaintiff from maintaining this lawsuit.

26. Plaintiff is acting in an erratic and illogical fashion in an effort to provoke and manufacture confrontation and legal expenses. This lawsuit is on its face frivolous and would appear to be an effort to distract from Plaintiff's more pressing legal complications with the authorities. I can only surmise that this lawsuit is retribution for the Van Dorn Defendants' cooperation with law enforcement in connection with a certain criminal investigation into Plaintiff by the New York County District Attorney's Office. Mere weeks after Plaintiff signed the Lease,

9

I was personally contacted by an NYPD detective of the Major Case Intelligence Team from the NYPD's Intelligence Division, and later, an assistant district attorney in the Rackets Bureau regarding an ongoing criminal investigation into Plaintiff. Shortly thereafter, I received a subpoena from the Rackets Bureau. I personally compiled and oversaw the production of documents and other information in the Van Dorn Defendants' possession responsive to the subpoena as legally required. Upon receiving Plaintiff's February 23, 2025 email(s), I immediately suspected Plaintiff's abrupt departure was related to the criminal investigation.

27. Regardless, Plaintiff's illogical and whimsical lawyering will continue unless and until the Court compels him to stop, by dismissing the Complaint against the Van Dorn Defendants with prejudice. The Van Dorn Defendants, and each of them, have already been greatly prejudiced by Plaintiff's immature and misguided actions, including attorneys' fees they, and each of them, have incurred and continue to incur defending this frivolous litigation, for which such fees the Van Dorn Defendants jointly and severally request a hearing to determine. While the recently admitted lawyer representing himself (pro se) has a cost advantage his very case is entirely meritless on its face and generated no economic loss or otherwise to him. As such, it would beg the Court to question as to what the Plaintiff's purpose is in this case as he has suffered no damages. Plaintiff's vindictive manipulation of the judicial system is wasteful and very costly to all involved.

28. The Van Dorn Defendants hereby adopt the legal arguments asserted by the Guarantors in motion sequence no. 1, insofar as same pertain to the Van Dorn Defendants, as further discussed, and to the extent stated, in my attorney's accompanying affirmation.

29. Finally, I unequivocally state that I have never once received a Notice of E-Filing from the Plaintiff in the manner and form required by the Court.

WHEREFORE, for the foregoing reasons, the Van Dorn Defendants respectfully request that their motion be granted in its entirety.

Dated: New York, New York
December 1, 2025

_____
MATTHEW GOLDBERG